IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

DOCKETED

JUL 2 9 2004

EASTERN DIVISION

# 04C 4948

Securities and Exhange Commission,

JUDGE DER-YEGHIAYAN

JUDGE BOBRICK

Plaintiff,

Civil Action No. _____

v.

Judge _____

Andrew J. Zahn,

Cynthia K. Berryman, and

Philip J. Sexauer

Defendants.

## COMPLAINT FOR PERMANENT INJUNCTION

## AND OTHER EQUITABLE RELIEF

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint,

alleges as follows:



## SUMMARY OF THE ACTION

1.     This case involves fraudulent misrepresentations about the financial condition of

DFG Foods, L.L.C., which, at the time was a wholly-owned subsidiary of Foodbrands

America, Inc., which in turn was a wholly-owned subsidiary of IBP, Inc., a public company

whose stock traded on the New York Stock Exchange.  Material misrepresentations in the

company's financial statements (related to its inventory, accounts receivable, prepaid

expenses and other accounts) caused IBP to materially overstate its earnings in

Commission filings for the fourth quarter of 1999 and the first three quarters of 2000.

2.     Andrew Zahn, DFG's president throughout the relevant period; Philip Sexauer,

DFG's chief financial officer ("CFO") in 1999; and Cynthia Berryman, DFG's CFO in

2000, caused the inflation of earnings and income to enable DFG to meet earnings

projections.  Defendants engaged in an array of accounting improprieties to materially

inflate DFG's earnings.

3.     Defendants Zahn and Berryman have engaged in and unless restrained and

enjoined by the Court will engage in, transactions, acts and practices and courses of

business that violate Section 10(b) of the Securities Exchange Act of 1934 ("Exchange

Act") and Rule 10b-5 thereunder.  Defendants Zahn, Berryman and Sexauer have

engaged in, and unless restrained and enjoined by the Court will engage in, transactions,

acts, practices, and courses of business that violate Section 13(b)(5) of the Exchange Act

and 13b2-1 thereunder.  Further, Defendants Zahn, Berryman, and Sexauer aided and

abetted IBP's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange

2

Act and Rules 12b-20 and 13a-1 thereunder. Defendants Zahn and Berryman also aided and abetted IBP's violations of Rule 13a-13 under the Exchange Act.

4.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. Sections 78u(d)] for an order permanently restraining and enjoining each of the defendants and granting other relief.

5.      The Commission seeks an order requiring defendants Zahn and Berryman to pay third tier civil penalties and Sexauer to pay second tier penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. Section 78u(d)(3)].

6.      The Commission seeks an order pursuant to the equitable authority of the court requiring each defendant to disgorge all ill-gotten gains from their participation in the fraud including all benefits derived from the individuals' employment by DFG such as bonuses and other remuneration and prejudgment and post-judgment interest thereon.

7.      The Commission seeks an order pursuant to Section 21(d)(2) of the Exchange Act, as amended by Section 305 of the Sarbanes-Oxley Act [15 U.S.C. 78u(d)(2)] or pursuant to the equitable authority of the court permanently barring Defendants Zahn and Berryman from being officers or directors of any public company.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. Sections 78u(e) and 78aa]. Venue lies in this Court pursuant to Section 27 of the Exchange Act.

9.      In connection with the transactions, acts, practices, and courses of business described in this Complaint, each of the defendants, directly and indirectly, has made

3

use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce.

10.     The principal place of business for DFG was located in this judicial district, and each Defendant resides in this judicial district.

## DEFENDANTS

11.     Andrew J. Zahn resides in Highland Park, Illinois. Zahn was the president and a partial owner of DFG's predecessor before IBP acquired DFG. He served as president of DFG until September 2000, when he resigned.

12.     Philip J. Sexauer resides in Lake Forest, Illinois. Sexauer began working for DFG's predecessor in January 1998 and became its CFO a few months before IBP's acquisition of the company in 1999. He remained as DFG's CFO through January 2000, when he was terminated.

13.     Cynthia K. Berryman resides in La Grange, Illinois. She was the controller of DFG from September 1999 until she was promoted to CFO in approximately February 2000 after Sexauer's termination. She remained as DFG's CFO until November 2000, when she was terminated as a result of IBP's internal investigation.

## GENERAL ALLEGATIONS

**Background**

14.     IBP, through its Foodbrands subsidiary, purchased DFG in October of 1998. In addition to the price IBP initially paid for DFG, the former owners of DFG, including

4

Zahn, negotiated a "contingent purchase price" which was payable only if DFG met or exceeded certain targets related to the earnings it reported to Foodbrands.

15.     After the combination, DFG reported its financial estimates and projections to Foodbrands every other week. Also, on a monthly basis, DFG provided Foodbrands with various statements and reports. Zahn reviewed and approved all reports that went to Foodbrands.

16.     Foodbrands used DFG's balance sheet and income statement, supplemented by other sources, in consolidating its own financial statements to submit to IBP. Foodbrands monitored DFG's financial performance and accounting methods through annual internal audits.

17.     Zahn became the president of DFG when Foodbrands acquired DFG. He also became a senior vice president of Foodbrands, reporting to Foodbrands' CEO. Zahn was heavily involved in determining DFG's accounting methodologies.

18.     Sexauer became DFG's CFO after the merger and was responsible for the preparation of DFG's financial statements to submit to Foodbrands.

19.     Foodbrands performed an internal audit of DFG's accounting records in November 1999. At that time, Foodbrands discovered various recordkeeping issues, including issues relating to DFG's inventory accounting. Soon after the audit was completed, in January of 2000, Zahn terminated Sexauer and promoted Berryman, who had been DFG's controller since September 1999, to the CFO position.

5

20.　　In July 2000, Foodbrands performed certain follow-up procedures to its earlier internal audit. Foodbrands also scheduled a second internal audit of DFG for October 2000. Zahn voluntarily resigned his position at DFG in September 2000.

21.　　During the October 2000 internal audit, Foodbrands identified additional issues with DFG's inventory balance and adjusted that balance downward before IBP filed its third quarter Form 10-Q.

**IBP's Restatements**

22.　　Upon completion of an internal review, in March 2001, IBP filed restated financial statements for its fiscal year ended December 25, 1999 and the first three quarters of 2000.[1]

23.　　As a result of DFG's misstatements, IBP made inventory-related adjustments of $17.3 million, accounts receivable-related adjustments of $4.1 million, and prepaid expense-related adjustments of $3.8 million for the year ended December 25, 1999 through the 39 weeks ended September 23, 2000. The restatements and other documents show that, as a result of DFG's misstatements, IBP originally overstated its net income by 7.5% in the fourth quarter of 1999, 5.9% in the first quarter of 2000, and

---

[1] IBP had filed its original Form 10-K for 1999 on March 23, 2000. It had filed its original Forms 10-Q for the first three quarters of 2000 on May 9, 2000, August 8, 2000, and November 7, 2000, respectively.

17.2% in the second quarter of 2000. IBP also overstated its year-to-date net income in its third quarter Form 10-Q by 6.3%.

**Accounting Misstatements**

24.     DFG's accounting misstatements primarily related to its inventory, accounts receivable, and prepaid expense asset accounts. With respect to each of these accounts, the defendants caused DFG to overstate the asset and understate the associated expenses (including cost of sales, bad debt, and other selling, general and administrative expenses) to delay the effect of these expenses on DFG's income statement and to make the income reported on the financial statements DFG sent to Foodbrands better match the estimates DFG had previously submitted to Foodbrands.

**Inventory: General method**

25.     Throughout 1999 and through the third quarter of 2000, DFG purported to use a method for valuing its finished goods inventory based on the "retail" method typically used by companies that resell goods purchased from other vendors. Pursuant to this method, a retailer with a consistent standard mark-up can determine the value of its inventory based upon a percentage of its sales price for the goods rather than valuing each component. Instead of separately valuing each of the various raw materials it used to manufacture its food products, DFG purported to use the retail method to determine the value of its finished goods inventory.

26.     However, in a manufacturing company like DFG, where the company must expend labor to manufacture its products, a value for labor and overhead must be

7

added to both the inventory and cost of sales balances. DFG initially expensed all of its labor and overhead costs. Then, at the end of the month, it would make a manual entry, termed an "absorption adjustment" by DFG personnel, to transfer some of these expenses to its inventory balance. Theoretically, these transferred amounts related to the labor and overhead expended in the production of the goods still in inventory at the close of the period, and therefore these entries would properly hold these charges to expense in the later period in which the inventory was sold. Zahn introduced this method of accounting for inventory to assure that DFG charged expenses associated with its labor and overhead costs primarily in the fourth quarter of the year when DFG sold most of its products.

27.     As detailed below, DFG did not have sufficient data to support its calculations of the cost or quantity of inventory, and the three proposed defendants ignored information from more junior accounting personnel about the accounting errors caused by DFG's flawed data. Moreover, at Zahn's direction, Sexauer, Berryman, and their staff manipulated the absorption entries to create a false appearance that DFG had met its earnings targets. DFG continued to follow its absorption accounting approach throughout the relevant period despite instructions from Foodbrands to change to a more conventional "standard cost" valuation methodology.

**Problems with costing and physical count**

28.     Though DFG purported to use a retail methodology, its costing of its finished goods inventory was flawed because the percentages it used were inaccurate. Zahn was instrumental in establishing these percentages. Because these percentages were

8

inaccurate, DFG consistently understated its costs of sales upon making a sale and overstated the amount of inventory remaining in its inventory account. The retail price from which DFG was calculating the cost of the materials was also often wrong, which led to inaccurate inventory valuation.

29.     DFG's inventory value was also wrong because DFG's estimate of quantities on hand was inaccurate. During both 1999 and 2000, DFG lacked a reliable perpetual inventory system to keep a continuous record of products in inventory. To determine the quantities of inventory on hand at the end of a period, DFG relied upon numerous estimates and a "roll-forward." DFG performed the roll-forward by taking the ending inventory amount for the previous month, and then adding actual and estimated purchases and production for the month, and subtracting known and estimated sales. However, the resulting ending inventory amount was not revised to replace estimates with actual numbers of purchases and sales, but was instead incorporated as the beginning inventory amount for the following month's calculation. DFG did not complete any complete physical count during the relevant period.

30.     Zahn, Sexauer, and Berryman were all aware of inaccuracies in both DFG's costing calculations and its product quantity estimates. On several occasions during the first half of 1999, Sexauer was made aware of concerns about DFG's inaccurate costing information. After DFG performed a partial physical inventory count in the second quarter of 1999, Sexauer was also aware that there was a significant discrepancy between the amount of inventory DFG had booked and the actual

9

inventory on hand, and that, as a result, the value of inventory on DFG's financial statements was materially overstated.

31.     Sexauer, on at least one occasion, personally challenged Zahn about the gross margin percentage Zahn had dictated for determining the value of some of DFG's inventory because he believed the adjustment Zahn dictated overstated earnings. Zahn, however, refused to modify this percentage.

32.     In early 2000, after Sexauer was terminated, DFG's Chicago plant controller performed the inventory calculations for Berryman to incorporate into DFG's financial statements. Soon after DFG closed its books for 1999, the plant controller met with Berryman and Zahn to discuss inaccuracies of the gross margin percentages DFG used to value its inventory. Zahn did not respond to his concerns. The plant controller also went to Berryman on numerous occasions thereafter in 2000 to explain that the inventory methodology DFG was following had the effect of understating DFG's true costs. However, Berryman took no action in response.

33.     The plant controller also challenged the quantity information DFG used in its inventory calculations. First in December 1999, and then during the first and third quarters of 2000, the plant controller performed partial physical inventory counts. Based upon these partial counts, he informed Berryman that the quantity information that DFG was using in its calculations was incorrect, and that DFG was therefore overstating the value of its inventory. Berryman instructed the plant controller to continue inventory calculations as before.

10

**Absorption Entries Generally**

34.     As set forth above, after DFG determined the value of its physical inventory, it
made an absorption adjustment to transfer labor and overhead costs into its inventory
balance.

35.     During the relevant period, DFG's general ledger reflected a large round number
entry as "absorption" for each month.  These absorption entries artificially brought
DFG's earnings in line with budgeted amounts.

**First Three Quarters of 1999**

36.     Before September 1999, Sexauer would sometimes propose the absorption
amount, and sometimes Zahn would do so.  If the financial statements showed
earnings lower than earnings targets, Zahn frequently instructed Sexauer or DFG's
controller to modify the absorption entry.

37.     Because of his growing concern over the accuracy of inventory as booked on
DFG's financial statements, DFG's controller (before Berryman) began asking Sexauer
to document his approval of questionable inventory journal entries.  When Sexauer
declined to do so, DFG's controller eventually booked them.  However, he would
frequently note "per P.S." or "PS" to indicate that there was no support for an entry.  In
July 1999, DFG's controller and a more junior DFG accountant found a journal entry
that Sexauer proposed relating to absorption to be so objectionable that they refused to
book it.  Instead, they wrote and had notarized a memorandum describing their
disagreement with this entry.  They raised their complaints with him, and Sexauer
eventually booked the entry himself.

11

38.     At the close of September 1999, Sexauer himself performed an analysis of whether the amount of absorption projected to be on DFG's books at the end of 1999 would be reasonable. Sexauer concluded that the approximately $2.0 million of capitalized labor and overhead projected to remain in the inventory account at year-end would be reasonable. Sexauer's calculations, however, were inherently flawed because they relied on costing data Sexauer knew was inaccurate.

**November 1999 Internal Audit**

39.     In November 1999 Foodbrands conducted its first internal financial audit of DFG's books and records. The Foodbrands internal auditor noted that DFG did not yet have a standard cost system in place but was using absorption entries to account for labor and overhead expended to manufacture inventory.

40.     The internal auditor determined that DFG had reported a value for its third quarter inventory which was approximately $2.2 million above the market price for that inventory. Accordingly, because he assumed that DFG's costing of its physical inventory was relatively accurate, he concluded that the overstatement resulted from inaccurate absorption entries.

41.     The Foodbrands internal auditor and Foodbrands' controller then discussed this overstatement with Sexauer. Zahn and Sexauer told them that DFG would resolve the overstatement through cost of sales entries in DFG's busy fourth quarter. Sexauer shared the reasonableness analysis he performed at the end of September with Foodbrands to support this position.

**Fourth Quarter of 1999**

12

42.    In the fourth quarter of 1999, when Berryman was DFG's controller, she supervised the plant controller in preparing the initial inventory absorption calculation for the end of 1999.

43.    Berryman supervised the plant controller's work and performed her own analysis of the fourth quarter 1999 inventory absorption figure. Berryman also recalculated the inventory absorption amount based on Sexauer's methodology. On December 29 and 30, 1999, Berryman sent e-mail messages to Sexauer attaching summary spreadsheets of DFG's final results for fiscal year 1999 which incorporated the $3.1 million of absorption. These spreadsheets compared the actual financial results DFG had achieved with the results DFG had forecasted to Foodbrands and showed a $2.5 million shortfall in DFG's earnings figure.

44.    Sexauer then faxed these financial results to Zahn, who was unhappy with the results and discussed the financial statements with Sexauer and Berryman. On December 31, 1999 (a holiday for DFG employees), Berryman, Sexauer and Zahn all met in Chicago to finalize the books. Berryman had prepared final proposed adjustments to DFG's general ledger for that meeting and showed them to Sexauer and Zahn at that time. After discussing the rationale for the adjustments with Sexauer and Zahn, Berryman made adjustments and with the approval of Sexauer and Zahn, sent the year-end financial statements to Foodbrands.

45.    The final adjustments concocted by the defendants included four entries to the general ledger which had the cumulative effect of increasing earnings by approximately $2.6 million, and which caused DFG to show that it had slightly exceeded its earnings

13

forecast. The last entry of the year, and the largest of the final four entries, was an adjustment to increase inventory and reduce expenses by $1.6 million. A notation in the ledger shows that this entry was an absorption entry, even though the $3.1 million of absorption previously determined to be appropriate was already included in the inventory account.

**First Three Quarters of 2000**

46.      Shortly after DFG sent its year-end financial statements to Foodbrands, in January 2000, Zahn terminated Sexauer. Berryman then replaced Sexauer as CFO, and she also presented the monthly financial statements to Zahn before the month-end close. Zahn would sometimes direct changes to the inventory absorption entries for the purpose of bringing inventory figures, and ultimately earnings, more in line with budgeted expectations.

47.      During the third quarter of 2000, Berryman attempted to expense some of the items that DFG had previously capitalized in inventory to make DFG's income statement more accurately reflect DFG's margin on the sale of its products. Zahn, however, instructed her to reverse these entries and to not charge these expenses until the fourth quarter.

**Prepaid Expenses**

48.      During the same period that they were manipulating DFG's inventory balance, Zahn, Sexauer and Berryman also improperly classified numerous expenses that did not have a future benefit as prepaid expenses. This was improper under Generally Accepted Accounting Principles ("GAAP") because only certain expenses can thus be

14

capitalized and only when they will result in a future benefit to the company. In addition, Berryman amortized prepaid expenses over a longer time period than was appropriate. These actions reduced the amount of expenses DFG reported to Foodbrands and therefore increased DFG's purported earnings figures in the same way the improper inventory entries did.

**Improper Classification**

49.     In 1999, DFG initially classified all of its costs as expenses. DFG tracked these expenses through a spreadsheet Sexauer created to show all expense items. The controller, Sexauer, and Zahn then culled through the spreadsheet to determine whether to make adjustments to book these expense amounts as prepaid expenses. In most cases, adjustments were made to move expenses to the prepaid account in rounded numbers, rather than the exact dollar amount of the actual expense.

50.     Zahn and Sexauer decided to treat many expenses, such as travel and recruiting expenses, as prepaid expenses even though they had no future benefit.

51.     On several occasions during the first half of 1999, Sexauer was told that these types of expenses should be expensed as incurred rather than classified as prepaid expenses. In addition, many entries to the prepaid expense account had no documentary support. Sexauer was asked to document his approval of various prepaid expense journal entries, but Sexauer refused. As a result, the same DFG accountants who had objected to inventory entries began noting some of these entries with the description "per Phil" or "per P.S.," which meant that Sexauer had directed the entries without any documentary support. In addition, in July 1999, Sexauer directed journal

entries that were so objectionable to the accounting staff that they refused to book

them. Sexauer recorded the entries himself.

52.     In the fall of 1999, at the direction of Zahn and Sexauer, Berryman attempted to

simplify DFG's accounting for prepaid expenses. Abandoning the previous time-

consuming practice of reviewing each expense to determine whether it should be

classified as a prepaid expense, Berryman simply included all marketing expenses as

prepaid expenses, regardless of their future benefit. Berryman reviewed non-marketing

expenses according to their dollar amount. She then took all large expenses to Zahn

for guidance on how to account for them. Zahn invariably told her to record large non-

marketing expenses in the prepaid account and to amortize them over the remainder of

the calendar year. These expenses included charges for such things as food shows

which had already occurred, recruiting fees, professional fees, and commissions, none

of which had any future benefit to support their classification.

**Improper Amortization**

53.     In the fall of 1999, when Berryman embarked on the task of simplifying DFG's

accounting for prepaid expenses, she changed the method for amortizing these

expenses. Her work superseded the previous treatment of prepaid expenses during

1999, and in some cases she recorded and re-amortized expenses that had already

been written off. Berryman would first segregate marketing expenses from other

expenses. She then amortized marketing expenses that were under $10,000 over the

course of two years. Higher dollar amount marketing expenses she amortized over

three years. She amortized all non-marketing expenses over a calendar year. DFG

16

followed these amortization schedules regardless of the actual future benefit of the prepaid expense. Because Berryman's amortization approach did not consider the future benefit of the prepaid expense, it was clearly not in conformity with GAAP.

54.     Berryman continued these practices throughout 2000 until she was terminated. At some point during the first half of 2000, DFG's accounting manager determined that certain recruiting fees had been improperly classified as prepaid expenses. He made journal entries to write off these amounts, but Berryman directed him to reverse the entries.

55.     Also, in May 2000 Berryman moved $857,000 of uncollectible accounts receivable to the prepaid expense account. Berryman had already researched these amounts and determined that they were either legitimate customer discounts or were uncollectible. Since the unapproved deductions related to past sales and had no future benefit, they should have been written off immediately.

**Accounts Receivable**

56.     As discussed above, in November 1999 Foodbrands conducted an internal financial audit of DFG. At that time, the Foodbrands auditor identified $4.3 million of accounts receivable on DFG's books that were more than ninety days past due. This amount represented one third of the total customer receivables at DFG. When the Foodbrands internal auditor questioned Sexauer about the aged receivables, Sexauer explained that the balance was due to "paperwork problems" such as lost purchase orders or incorrect invoices.

17

57.     Accordingly, in December 1999, Berryman worked on a project to research these receivables and take appropriate action. By the end of December, Berryman had determined that approximately $777,000 of unpaid, unapproved deductions remained in DFG's accounts receivable as of year-end 1999. Berryman asked Zahn whether she should create a reserve for the unapproved deductions. She also noted that at least a portion of the outstanding amount was "totally unsupported" and should be written off. Zahn instructed her to keep the deductions on the balance sheet.

58.     By February of 2000, Berryman had determined that several other outstanding receivables were uncollectible. Berryman then approached Zahn to inquire about writing off these uncollectible receivables. Zahn told her to hold the receivables collectively as an asset on DFG's books until the end of 2000 when they would all be written off together, instead of writing them off piecemeal throughout the year. Berryman did not question Zahn's directive.

59.     Acting on Zahn's instructions to "isolate" the uncollectible receivables, in February 2000 Berryman created a balance sheet account she styled "AR Pending Writeoff," and she began transferring these receivables to this account. The account included only these uncollectible receivables, and the amounts in the account were not included in the aging reports DFG sent to Foodbrands. Because DFG did not write off these receivables during the first quarter, but instead held them in another asset account, DFG overstated its first quarter earnings by the entire amount in the account, which was $504,000.

60.    Although Berryman agreed to hold the unapproved deductions and other uncollectible receivables as assets in the first quarter, she determined in the second quarter of 2000 that DFG should write off portions of these accounts. In April 2000, Berryman determined that DFG's outstanding unapproved deductions balance should be written off, but, after she approached Zahn, he instructed her to keep that balance on DFG's balance sheet. Thereafter, as discussed *supra*, she moved $857,000 of these uncollectible amounts to the prepaid expense account in May 2000.

61.    Also, in approximately May 2000 Berryman determined that DFG should write off the amount of the uncollectible receivables in the AR Pending Writeoff account. Accordingly, she wrote off approximately $1.4 million (the balance of the account) on May 20, 2000, but did not close the account. However, at the same time, she opened a new asset account for "freight accrual" in DFG's ledger. Although it was completely unsupported, she established an opening balance for this account in the same amount she had written off from the AR Pending Writeoff account. Through these actions, Berryman effectively moved the balance of the AR Pending Writeoff account into another improper asset account and avoided any negative impact of the writeoff on DFG's earnings.

62.    Berryman continued to move additional receivables to the AR Pending Writeoff account as she deemed those receivables uncollectible, and from June to September 2000, the balance began growing again. In the summer of 2000, Berryman informed Zahn that she wished to write off approximately $800,000 of that account. At Zahn's direction, she did not make the write-off.

63.     In September 2000, without Zahn's approval, Berryman wrote off part of the freight accrual, the balance of the AR Pending Writeoff account, and another allowance account. As a result of these write-offs, DFG missed its earning targets for the month. When Zahn learned of the shortfall, he instructed Berryman to reverse the write-offs and wait until the fourth quarter to take them. Berryman understood that Zahn wanted to ensure that DFG made its numbers for the month. As set forth above, Zahn resigned in September and therefore was not present when DFG later was forced to write off these amounts during the fourth quarter of 2000.

**Zahn, Sexauer and Berryman Profit From Misstatements**

64.     As a direct result of their inflation of DFG's earnings, each of the three defendants received a part of the "contingent purchase price" paid to the former owners of DFG based on DFG's 1999 performance. This payment, termed the "earn-out" payment by DFG personnel, was negotiated at the time of IBP's acquisition of DFG and was potentially payable for each of the years from 1999 through 2001. The actual amount of the payment was calculated using a formula based upon DFG's earnings for each relevant fiscal year. Based on DFG's reported earnings for the 1999 fiscal year, Foodbrands paid approximately $7.8 million in approximately April 2000 to Zahn and the other former owners of DFG. Zahn received millions of dollars from this payment. Zahn paid Sexauer and Berryman a portion of his earn-out payment.

65.     Zahn, Sexauer and Berryman were also paid incentive bonuses relating to 1999 performance. Zahn's and Sexauer's employment contracts specified that these

20

incentives would be based upon DFG's financial performance as measured by earnings, and calculated as a percentage of total salary.

## FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act

### [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

66.     Plaintiff repeats and realleges paragraphs 1 through 65 above.

67.     Defendants Zahn and Berryman, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or by use of the mails, have employed devices, schemes, or artifices to defraud; have made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers or sellers of such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

68.     By reason of the foregoing, defendants Zahn and Berryman violated and, unless restrained and enjoined, will violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## SECOND CLAIM

### Aiding and Abetting of IBP's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder

69.     Plaintiff repeats and realleges paragraphs 1 through 65 above.

70.     IBP violated Exchange Act Section 13(a) and Rules 12b-20, 13a-11, and 13a-13,

as an issuer of a security registered pursuant to Section 12 of the Exchange Act, in

filing materially misleading annual and quarterly reports with the Commission and failing

to file with the Commission, in accordance with rules and regulations the Commission

has prescribed, information and documents required by the Commission to keep

current information and documents required in or with an application or registration

statement filed pursuant to Section 12 of the Exchange Act and annual reports and

quarterly reports as the Commission has prescribed for its fourth quarter of 1999 in its

1999 Form 10-K, and by filing misstated financial information in its Forms 10-Q for the

first, second, and third quarters of 2000.

71.     By reason of the foregoing, each defendant aided and abetted and unless

restrained and enjoined will aid and abet violations of Section 13(a) of the Exchange

Act and Rules 12b-20 and 13a-1 thereunder.

72.     By reason of the foregoing, Zahn and Berryman aided and abetted and unless

restrained and enjoined will aid and abet violations of Rule 13a-13 under the Exchange

Act.

### THIRD CLAIM

### Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1

74.     Plaintiff repeats and realleges paragraphs 1 through 65 above.

75.     All defendants violated Exchange Act Section 13(b)(5) and Rule 13b2-1

thereunder, because they knowingly circumvented or knowingly failed to implement a

system of internal accounting controls and knowingly falsified books, records, or

22

accounts of a subsidiary of IBP, an issuer of a security registered pursuant to Section 12 of the Exchange Act, which thereby failed to (A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that -- (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

76.     By reason of the foregoing, all of the defendants violated and, unless restrained and enjoined, will violate Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder.

## FOURTH CLAIM

### Aiding and Abetting of IBP's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B).

77.     Plaintiff repeats and realleges paragraphs 1 through 65 above.

78.     Each defendant aided and abetted violations of Exchange Act Section 13(b)(2)(A) and 13(b)(2)(B) in that IBP, which was an issuer that had a class of securities registered pursuant to section 12 of the Exchange Act failed to (A) make and

keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that -- (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

81.     By reason of the foregoing, each defendant aided and abetted violations of and and unless restrained and enjoined will aid and abet violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B).

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court:

I.

Find that the defendants, and each of them, committed the violations alleged.

II.

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each defendant, their agents, servants, employees and attorneys, and those persons in active concert or participation

with them who receive actual notice of a judgment by personal service or otherwise, and each of them, from violating, directly or indirectly, the provisions of law and rules alleged in this Complaint.

III.

Order each defendant to disgorge and pay over, as the Court may direct, all ill-gotten gains received or benefits in any form derived from the illegal conduct alleged in this Complaint, together with pre-judgment and post-judgment interest as provided by law.

IV.

Order defendant Sexauer to pay a second tier civil money penalty and defendants Zahn and Berryman to pay third tier civil money penalties pursuant to Section 21(d)(3) of the Exchange Act.

V.

Enter an Order barring Zahn and Berryman from serving as an officer or director of any publicly held company pursuant to Section 21(d)(2) of the Exchange Act and the equitable powers of the Court.

VI.

Grant such other relief as this Court may deem just or appropriate.

Dated: July 27, 2004

Respectfully submitted,

Elizabeth E. Krupa
Robert M. Fusfeld
Attorneys for Plaintiff
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, Colorado 80202
(303) 844-1000

26

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

## Civil Cover Sheet 04C 4948

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

JUDGE DER-YEGHIAYAN

| | |
|---|---|
| **Plaintiff(s): Securities and Exchange Commission** | **Defendant(s):Andrew J. Zahn, Cynthia K. Berryman, and Philip J. Sexauer** |
| County of Residence: | County of Residence: Lake County |
| Plaintiff's Atty: Elizabeth E. Krupa<br>Securities and Exchange Commission<br>1801 California St., Suite 1500,<br>Denver, CO 80202<br>303-844-1036 | Defendant's Atty: |

MAGISTRATE JUDGE BOBRICK

DOCKETED

JUL 2 9 2004

II. Basis of Jurisdiction:  **1. U.S. Gov't Plaintiff**

III. Citizenship of Principal
Parties (Diversity Cases Only)
              Plaintiff:- **N/A**
              Defendant:- **1 Citizen of This State**

IV. Origin :                **1. Original Proceeding**

V. Nature of Suit:         **850 Securities / Commodities / Exchange**

VI.Cause of Action:       **Based on violations of Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5 and 13b2-1 thereunder, and aiding and abetting of IBP, Inc.'s ("IBP") violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder**

VII. Requested in Complaint
             Class Action: **No**
             Dollar Demand:
             Jury Demand: **No**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

**Signature:** *Elizabeth E. Krupa*     7-28-04

**Date:** 7/28/04

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**                    Revised: 06/28/00

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

JUL 2 9 2004

In the Matter of

Securities and Exchange Commission, Plaintiff
v.
Andrew J. Zahn, Cynthia K. Berryman, and Philip J.
Scxauer

Case Number:



04C 4948

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff, Securities and Exchange Commission

JUDGE MARYECHIAYAN

MAGISTRATE JUDGE BOBRICK

| (A) | | | | (B) | | | |
|---|---|---|---|---|---|---|---|
| SIGNATURE *Elizabeth E. Krupa* | | | | SIGNATURE *Robert M. Fusfeld* | | | |
| NAME Elizabeth E.Krupa | | | | NAME Robert M. Fusfeld | | | |
| FIRM Securities and Exchange Commission | | | | FIRM same as (A) | | | |
| STREET ADDRESS 1801 California st. Suite 1500 | | | | STREET ADDRESS | | | |
| CITY/STATE/ZIP Denver, CO 80202 | | | | CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER 303-844-1000 | | FAX NUMBER 303-844-1068 | | TELEPHONE NUMBER | | FAX NUMBER | |
| E-MAIL ADDRESS krupae@sec.gov | | | | E-MAIL ADDRESS fusfeldr@sec.gov | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☑ | | MEMBER OF TRIAL BAR? | YES ☐ | NO ☑ | |
| TRIAL ATTORNEY? | YES ☐ | NO ☐ | | TRIAL ATTORNEY? | YES ☐ | NO ☑ | |
| | | | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☑ | |
| (C) | | | | (D) | | | |
| SIGNATURE | | | | SIGNATURE | | | |
| NAME Jerome Tomas | | | | NAME | | | |
| FIRM Securities and Exchange Commission | | | | FIRM | | | |
| STREET ADDRESS 175 West Jackson Blvd., Suite 900 | | | | STREET ADDRESS | | | |
| CITY/STATE/ZIP Chicago, Il. 60604 | | | | CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER 312-353-7390 | | FAX NUMBER 312-353-7398 | | TELEPHONE NUMBER | | FAX NUMBER | |
| E-MAIL ADDRESS tomasj@sec.gov | | | | E-MAIL ADDRESS | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6276059 (Ill. ARDC No.) | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | |
| MEMBER OF TRIAL BAR? | YES ☑ | NO ☒ | | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | |
| TRIAL ATTORNEY? | YES ☐ | NO ☑ | | TRIAL ATTORNEY? | YES ☐ | NO ☐ | |
| DESIGNATED AS LOCAL COUNSEL? | YES ☑ | NO ☐ | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | |